## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Marc Amouri Bakambia,                                            No. 20-cv-1434-NEB-KMM

                            Plaintiff,

v.                                                                          **REPORT AND**
                                                                           **RECOMMENDATION**
Paul Schnell, et al.,

                            Defendants.

This matter is before the Court on Marc Amouri Bakambia's motion for preliminary injunctive relief. ECF No. 46. Mr. Bakambia seeks an order requiring the Defendants to provide him with medical care he contends is necessary to treat a traumatic brain injury. Specifically, he asks the Court to order the Defendants to refer him to a neurological specialist for evaluation and treatment. For the reasons below, the Court recommends that Mr. Bakambia's motion be denied.

## I.    Factual Background

The relevant facts are set forth in Mr. Bakambia's complaint and in the evidentiary materials submitted by the parties in connection with the motion for a preliminary injunction. In this background section, the Court details the allegations set forth in Mr. Bakambia's complaint. The Court more fully addresses the relevant evidence in its legal analysis below.

Mr. Bakambia filed his complaint on June 22, 2020. Compl., ECF No. 1.[1] One group of Defendants is comprised of State of Minnesota employees, which the Court refers to as the "State Defendants." This group includes: Paul Schnell; Guy Bosch; Victor Wanchena; and Tammy Lisowy.[2] Another group of Defendants, referred to collectively as the "Centurion Defendants," are employees of Centurion Healthcare. Centurion coordinates and provides healthcare services for inmates in the custody of the Minnesota Department of Corrections. The Centurion Defendants include: Dr. Louis Shicker; Dr. Darryl Quiram; and Brent Plackner, P.A. Compl. at 6–7, ¶¶ 12–14. As relevant to the pending motion, Mr. Bakambia alleges that all Defendants violated his Eighth Amendment rights because they have exhibited deliberate indifference to his serious medical needs. *Id.* at 4 ¶ 1.

On May 20th and 21st, 2019, while he was in a segregated housing unit at the Minnesota Correctional Facility in Rush City ("MCF Rush City"), Mr. Bakambia was assaulted by three inmates. *Id.* at 8, ¶ 16. He sustained fractured ribs and was diagnosed with post-traumatic stress disorder, chronic headaches, and a "head injury." *Id.* at 8, ¶¶ 17–19. Mr. Bakambia also complained of problems with his eyesight and reported depression, anxiety, and insomnia. *Id.* at 8, ¶¶ 22–24. About two months after the assault, Mr. Bakambia was transferred to MCF Stillwater, where he continued raising concerns about his medical condition. *Id.* at 8, ¶ 21.

---

[1]    Throughout this R&R, the Court cites to the page numbers generated by the Court's Electronic Case Filing system.

[2]    Mr. Schnell is the Commissioner for the Department of Corrections. Compl. at 6, ¶ 9. Mr. Bosch is the Warden for the Minnesota Correctional Facility in Stillwater ("MCF Stillwater"). *Id.* at 6, ¶ 10. Mr. Wanchena is the Associate Warden at MCF Stillwater. *Id.* at 6, ¶ 11. And Ms. Lisowy is a staff psychologist at MCF Stillwater. *Id.* at 7, ¶ 15.

Mr. Bakambia saw Dr. Quiram on July 31, 2019, for less than two minutes, and requested an MRI of his brain. *Id.* at 8–9, ¶ 26. He alleges that he briefly saw Dr. Quiram again on August 14, 2019. At that appointment, Mr. Bakambia complained of headaches and problems with his left eye. *Id.* at 9, ¶ 29. Mr. Bakambia asked Dr. Quiram to explain the term "TBI" to him "because he had just learned of this diagnosis…." *Id.* at 9, ¶ 30. Dr. Quiram "stated that, in the past, Plaintiff was diagnosed with Traumatic Brain Injury during the assault, then left the room." *Id.* at 9, ¶ 31. In September 2019, Dr. Quiram allegedly changed the dosage of medications being used to treat his symptoms, but he refused to order that it was medically necessary for Mr. Bakambia to be moved to a cell on a lower floor. *Id.* at 9–10, ¶¶ 36–37.

In October 2019, Mr. Bakambia began having trouble waking up in the morning and continued having trouble sleeping. *Id.* at 10, ¶ 38. He also had symptoms of nausea, lost his sense of taste, and developed eye pain and discomfort in his brain. *Id.* Dr. Quiram allegedly continued to deny Mr. Bakambia's requests for an MRI and to be seen by a neurologist. *Id.* at 10, ¶ 39. Dr. Quiram "advised Plaintiff that he will ask M.D. Shicker for more testing." *Id.* Dr. Shicker is the medical director for MCF Stillwater.

In mid-October 2019, Mr. Bakambia alleges that he received the wrong medication. On November 6, 2019, he was sent to the emergency room at a nearby hospital. Afterward, he was returned to MCF Stillwater and saw Mr. Plackner, a physician's assistant, on November 7, 2019. *Id.* at 10, ¶¶ 41–45. Mr. Plackner and Mr. Bakambia discussed the testing that was performed at the hospital, and Mr. Plackner informed him that the results were normal. *Id.* at 10, ¶ 46. Mr. Plackner suggested Mr. Bakambia take Amitriptyline to address

his problems with sleeping and headaches. *Id.* In the days that followed, Mr. Plackner continued to assess Mr. Bakambia's condition and address his complaints about the side-effects of Amitriptyline. *Id.* at 11, ¶¶ 47–51.

On December 4, 2019, Mr. Bakambia saw Dr. Shicker regarding his various health concerns. Dr. Shicker informed him that his tests from his emergency room visit were all normal, including the results of a CT scan and an electrocardiogram. *Id.* at 11, ¶¶ 52–53. Dr. Shicker believed Mr. Bakambia was suffering from post-concussive syndrome, discontinued the Amitriptyline prescription, and advised Mr. Bakambia to purchase Excedrin pain-relief medication. *Id.* at 11, ¶ 54. Later in December, Mr. Bakambia saw Dr. Quiram for complaints of fatigue, difficulties waking up in the morning, headaches, and dizziness. *Id.* at 11, ¶ 55. Despite these medical appointments, he continued experiencing headaches and other symptoms through early January 2020. *Id.* at 11, ¶ 56.

Mr. Plackner saw Mr. Bakambia on January 10, 2020, and allegedly interrogated him for almost an hour about his use of the medications he had been prescribed. *Id.* at 12, ¶¶ 58–59. Mr. Plackner allegedly stated that he would order Mr. Bakambia to have diabetes tests based on his food consumption. *Id.* at 12, ¶ 60. Later that day, Mr. Bakambia lost consciousness while in his cell and was transferred to Health Services, but he was sent back to his room without an EKG test. He was ordered to use a wheelchair as a walker, but a corrections officer took it away at the unit gate. *Id.* at 12, ¶ 61.

After this incident, Mr. Bakambia alleges that he learned his November 6, 2019 emergency room tests were not entirely normal as he had been told by Mr. Plackner and Dr. Shicker. In particular, he states: "his ECG results showed: serious rhythm, non specific

T wave abnormality and abnormal ECG on which none of the providers discuss this with plaintiff." *Id.* at 12, ¶ 63. He asked Mr. Plackner about these abnormalities during a February 3, 2020 sick call. Mr. Plackner advised Mr. Bakambia that "ECG and EKG are the same thing, EKG is a photograph of your heart, it shows how your heart is doing at the time. Since the latest EKG was normal, he wouldn't worry about it." *Id.* at 12, ¶¶ 64–66. Mr. Bakambia received additional treatment from Mr. Plackner in February 2020 regarding his complaints of stomach or abdominal pain and Mr. Plackner attempted to coordinate his care given his fatigue and difficulties waking up in the morning. *Id.* at 13–14, ¶¶ 68–75.

On February 15, 2020, Mr. Bakambia began experiencing pain on the "left mid-to-frontal side of his brain" while taking a medication Mr. Plackner had prescribed. When he signed up for sick call, however, no one saw him. *Id.* at 14, ¶ 76. He signed up for sick call again on February 20, 2020, because the pain was getting worse. *Id.* at 14, ¶ 77. He lost consciousness in the afternoon of February 22nd and was taken to Health Services and placed on medical isolation for three days. *Id.* at 14, ¶ 78. On February 24th, Mr. Plackner allegedly denied Mr. Bakambia's request for a neurology consultation and "stated that he doesn't see any neurological deficits, even the neurologist will say the very same thing." *Id.* at 14, ¶ 80. That same afternoon, Mr. Bakambia met with Ms. Lisowy, a staff psychologist at MCF Stillwater, and complained of depression, anxiety, lack of dreams since he was assaulted, fatigue, and problems waking up in the morning. *Id.* at 14, ¶¶ 82–83. Ms. Lisowy

told Mr. Bakambia that his concerns were all "of a physical nature that concern Health Services" and did not establish a plan for mental-health care. *Id.* at 14, ¶ 84.[3]

Mr. Bakambia seeks $250,000 in actual damages and another $250,000 in punitive damages. Compl. at 5. Mr. Bakambia states that he is seeking injunctive relief as a part of his complaint, but he does not specify what form of an injunction he seeks. *Id.* at 5, ¶ 6 ("Plaintiff claims for injunctive relief are authorized by 28 U.S.C. section 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure."). In his prayer for relief, he crossed out an encompassing request for an "order enjoining Defendants from engaging in any unlawful act, omission, practice stated herein." *Id.* at 5. However, in a July 2019 letter to Commissioner Schnell that is attached to the complaint, Mr. Bakambia requested to be seen by "outside doctors" or a "specialist." Compl., Ex. A at 3. Similarly, in a February 2020 letter to Commissioner Schnell, Mr. Bakambia asks for an order to see a neurologist. *Id.*, Ex. B at 5. Based on these attachments, and reading his complaint as a whole, the Court can reasonably conclude that his request for injunctive relief includes, at a minimum, a request for an order requiring the defendants to refer him to a neurologist for assessment and treatment. Thus, a portion of the ultimate relief he seeks in his complaint is consistent with the request he makes in his motion for a preliminary injunction.

---

[3]    Mr. Bakambia also includes several allegations regarding the Defendants preventing him from having a meeting with an attorney, though these allegations do not implicate his motion for preliminary injunctive relief. Compl. at 14–16, ¶¶ 85–99.

## II.    Legal Standards

In deciding whether to issue a preliminary injunction, district courts consider four

factors:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance
> between this harm and the injury that granting the injunction will inflict on
> other parties litigant; (3) the probability that movant will succeed on the
> merits; and (4) the public interest.

*Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys.,*

*Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

"While no single factor is determinative, the probability of success factor is the most

significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citing *Barrett v.*

*Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013)) (internal quotations and citation omitted). "If a

party's likelihood of succeeding on the merits is sufficiently low, a court may deny a

preliminary injunction even if the other three factors—irreparable harm, balance of harms,

and the public interest—weigh in the party's favor." *McMahon v. Delta Air Lines, Inc.*, 830 F.

Supp. 2d 674, 688 (D. Minn. 2011). This factor does not require the moving party to "prove

a greater than fifty per cent likelihood that he will prevail on the merits." *Dataphase*, 640 F.2d

at 113 (rejecting a test that would require the movant to show a "mathematical probability of

success at trial"). Instead, the movant is required to show a "fair chance" of succeeding on

the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

"Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief

is improper absent a showing of a threat of irreparable harm." *Roudachevski v. All-American*

*Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citing *Watkins*, 346 F.3d at 844). To

establish irreparable harm for purposes of a preliminary injunction a party must show "that a

cognizable danger—more than a 'mere possibility'—exists of a future violation." *C.H. v. Sullivan*, 718 F. Supp. 726, 730 (D. Minn. 1989). "'[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski*, 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996)).

The party seeking a preliminary injunction bears the burden of showing that an injunction should issue. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits." *Brooks v. Roy*, 881 F. Supp. 2d 1034, 1049 (D. Minn. 2012) (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir. 1993); *Scott v. Benson*, 863 F. Supp. 2d 836, 842 (N.D. Iowa 2012) (same); *Aerotek, Inc. v. Murphy*, No. 4:17CV2469 HEA, 2017 WL 4617109, at * 6 (E.D. Mo. Oct. 16, 2017) (same).

## III.  Discussion

Mr. Bakambia asks the Court to address the Defendants' alleged deliberate indifference to his diagnoses of a traumatic brain injury and chronic headaches by requiring the Defendants to refer him to a specialist. He asserts that constitutionally adequate care requires, at a minimum, that he be seen for an in-person evaluation by a neurologist, but the Defendants have rejected his requests for such a referral. For the reasons that follow, the Court concludes that Mr. Bakambia has failed to meet his heavy burden of showing that the requested injunction should issue and his motion should be denied.

A.    **Likelihood of Success**

Analyzing the likelihood of success on the merits requires the Court to evaluate the standards governing Eight Amendment deliberate-indifference claims.

### Deliberate Indifference Standard

The Eighth Amendment prohibits "cruel and unusual punishments." *Estelle v. Gamble*, 429 U.S. 97, 101–02 (1976). This standard requires each state "to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. Prison officials violate the Eighth Amendment when "they commit 'acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs.'" *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting *Estelle*, 429 U.S. at 106). In this context, a plaintiff must show "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

A deliberate-indifference claim based on a failure to provide treatment requires an inmate to establish that "prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Dulany*, 132 F.3d at 1239. "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoners' serious medical needs." *Id.* (citing *Estelle*, 429 U.S. at 104–05). Mere negligence, however, is not enough to demonstrate a constitutional violation. *Id.* (citing *Estelle*, 429 U.S. at 106).

It is not enough for a prisoner to simply argue that a different course of care would be more effective. Courts have repeatedly noted that a prisoner's "difference of opinion over matters of expert medical judgment or a prescribed course of medical treatment fails to state a federal constitutional question." *See, e.g.*, *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir. 1981).

This does not mean that a deliberate indifference claim can never be successful simply because a prisoner has received some care. Indeed, "a total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). A defendant may also be liable for intentionally delaying access to medical care. *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). Where prison officials have provided treatment that is grossly inadequate to address a prisoner's condition, a preliminary injunction requiring the provision of additional necessary care may be appropriate. *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764, at *12 (E.D. Mo. Feb. 9, 2018) (rejecting argument from Missouri Department of Corrections that plaintiff was unlikely to succeed on the merits of her Eighth Amendment claim because she was merely disagreeing with the refusal to provide her preferred treatment for gender dysphoria).

### Evidentiary Record

Here, the evidentiary record reveals that following the assault at MCF Rush City in May 2019, Mr. Bakambia received significant medical attention for his concerns, including

those that could potentially be addressed by a neurologist. Because the nature of the care received is relevant in assessing Mr. Bakambia's motion for an injunction, a detailed recitation of his medical records is necessary.

On July 31, 2019, Mr. Bakambia saw Dr. Quiram and was "demanding an MRI of his brain," and in the notes from that visit, Dr. Quiram described Mr. Bakambia's course of treatment following the assault in May. Reid Decl., Ex. 1 at 1, ECF No. 64. The notes from this encounter indicate that Mr. Bakambia had been seen at MCF Rush City on July 3, 2019 for his headache complaints and facial-bone X-rays taken that day were negative.[4] *Id.* Though Mr. Bakambia was experiencing discomfort on the left side of his head, he had not reported nausea, vomiting, or problems with his equilibrium. *Id.* He was diagnosed at that time with post-traumatic head injury and was prescribed Topamax. *Id.* Mr. Bakambia had a follow-up appointment on July 12, 2019, when his dosage of Topamax was increased. *Id.* On July 19th, he was prescribed naproxen to address his continued headache complaints, but "[h]is exam at that time showed no neurological deficits." *Id.* Dr. Quiram found that Mr. Bakambia "does not have any neurological deficits to warrant emergent concerns for further brain imaging," and increased his dosage of Topamax. *Id.*

On September 9, 2019, Mr. Bakambia saw Dr. Quiram with complaints of headaches and dizziness. Pl.'s Ex. 1, ECF No. 77. Dr. Quiram diagnosed Mr. Bakambia with "TBI with chronic headache," found that Mr. Bakambia presented "no neurological deficit," and

---

[4]     Dr. Quiram's July 31, 2019 encounter notes state that he had "no details of the ICS report" regarding the assault in May. Reid Decl., Ex. 1 at 1. It is unclear precisely what evaluation and treatment was conducted in the immediate aftermath of the assault.

increased Mr. Bakambia's dosage of Topamax to 100 mg twice a day. *Id.* He agreed to place Mr. Bakambia on a "second tier" restriction to address his concerns about falling. *Id.* A month later, Dr. Quiram saw Mr. Bakabmia again for continued issues with headaches, dizziness, fatigue, and mood swings. *Id.* Due to the "persistence with his complaints" Dr. Quiram indicated he would request an MRI of Mr. Bakambia's head and would have him see Dr. Shicker. *Id.*

On October 24, 2019, Mr. Bakambia was in the clinic at MCF Stillwater and was informed about an upcoming appointment with Dr. Shicker. Pl.'s Ex. 4. He expressed concerns about the medication he had been given on October 15th, asked to have a lab draw, and requested information about the half life of Topamax. *Id.*

On November 6, Mr. Bakambia was taken to an emergency room after he was found lying in front of his cell. Pl.'s Ex. 1a. The ER notes indicated he was fluttering his eyes and moving his head around complaining of a headache and neck pain. *Id.* Mr. Bakambia could not recall what happened, was unable to say the day of the week, but knew he was in MCF Stillwater. Pl.'s Ex. 4. Dr. Quiram was notified about the incident and gave the order for Mr. Bakambia to go to the ER. Pl.'s Ex. 4(a). A CT scan showed "no evidence of acute hemorrhage or other acute intracranial abnormality." *Id.* A HealthPartners note from an ECG test on November 6, 2019 includes the following notation:

Sinus rhythm
Nonspecific T wave abnormality
Abnormal ECG
No previous ECGs available

Pl.'s Ex. 7. Other HealthPartners records document the treatment Mr. Bakambia received at the emergency room. Pl.'s Ex. 24.[5]

On November 7, 2019, Mr. Plackner saw Mr. Bakambia for a follow-up appointment following his ER visit the previous day. Pl.'s Ex. 1a. Mr. Bakambia told Mr. Plackner that he felt he was doing worse on the Topamax, stated that he had no history of headaches before the assault in May, and denied nausea or vomiting. *Id.* Mr. Plackner noted that Bakambia discontinued his Topamax himself prior to the November 6th incident.[6] *Id.* Mr. Plackner advised Mr. Bakambia "that medications like the Topamax can have rebound ramifications if they are discontinued abruptly, which may be a part of what happened yesterday." *Id.* He also noted that Mr. Bakambia drinks coffee. *Id.* Mr. Bakambia agreed to take Tylenol for an acute headache and Mr. Plackner started him on Amitriptyline at bedtime to improve sleep and reduce the frequency of the headaches. *Id.*

Mr. Plackner saw Mr. Bakambia again on November 13, 2019 for continued complaints of headaches and to address Mr. Bakambia's trouble sleeping. Pl.'s Ex. 11. Mr. Plackner's examination revealed no photophobia, and he found Mr. Bakambia was not in any acute distress. *Id.* He determined that Mr. Bakambia should continue to drink fluids,

---

[5]    These records show, among other things, no signs of Burgada syndrome following the November 6, 2019 emergency room visit. Novak Aff., Ex. A at 4, ECF No. 58. Brugada syndrome "is a rare, but potentially life-threatening heart rhythm disorder that is sometimes inherited." Mayo Clinic, Burgada syndrome, https://www.mayoclinic.org/diseases-conditions/brugada-syndrome/symptoms-causes/syc-20370489 (last visited February 22, 2021); *see also* Pl.'s Ex. 31 (discussing Burgada syndrome as a heart problem that has shown up in some people taking Nortriptyline); Pl.'s Ex. 32 (Mayo Clinic web page printout).

[6]    On October 21, 2019, Mr. Bakambia signed a notice indicating that he was refusing Topamax and Naproxen and acknowledged that doing so may risk an increase in his headache symptoms. Pl.'s Ex. 3.

and reminded him that he should take Tylenol as needed and that he could purchase naproxen, ibuprofen, or Excedrin from the canteen. *Id.* Mr. Plackner recommended Excedrin, requested an optometry appointment, continued Amitriptyline, and agreed to see Mr. Bakambia in a month or sooner if his symptoms changed. *Id.*

On December 4, 2019, Mr. Bakambia saw Dr. Shicker on a referral regarding headaches and "visual disturbances." Pl.'s Ex. 11(a). Mr. Bakambia reported to Dr. Shicker that a physician at MCF Rush City told Mr. Bakambia he suffered a TBI during the May 2019 assault and that he was having headaches and trouble focusing since the incident. *Id.* Mr. Bakambia reported experiencing some nausea with his headaches, but there was no documented vomiting. *Id.* Dr. Shicker found Mr. Bakambia was in no acute distress on exam and that his pupils were "equal, round, reactive to light & accommodation." *Id.* Further, Dr. Shicker noted: the extraocular muscles were intact; no papilledema; intact cranial nerves; normal gait; motor and sensory of upper and lower extremities were within normal limits; no motor shift; no nystagmus; and symmetrical reflexes. *Id.* It was Dr. Shicker's impression that Mr. Bakambia had "prolonged post concussive syndrome" and he doubted there was a new history of migraine headaches. *Id.* Dr. Shicker also noted the normal findings after the November 6, 2019 ER visit, including the normal CT scan and an EKG test. *Id.* With the negative CT results and the likely post concussive syndrome, Dr. Shicker told Mr. Bakambia "that the best thing for him to do is to try to get into a routine to exercise when he can and to try to go to bed at the same time and wake up at the same time regardless of how much sleep he had, to try to exercise daily and to eat as regularly as he can." *Id.* Dr. Shicker was inclined to discontinue his Amitriptyline and planned to double check for other, more recent

recommended treatments for post concussive syndrome. *Id.* Dr. Shicker noted that Mr. Bakambia's sentence would not be concluded for another 12 years and stated "if he does not have some improvement within the next several months he may need a further evaluation with a possible neurology consultation, but for now I do not think that this is indicated." *Id.* Mr. Bakambia said he understood Dr. Shicker's explanation, but was noted to be "somewhat frustrated by no quick fixes." *Id.*

Mr. Plackner saw Mr. Bakambia again on February 10, 2020 to discuss recent lab work and a diagnosis of a helicobacter pylori infection. Pl.'s Ex. 13. Mr. Bakambia wanted to change the times he was supposed to receive the medications to treat this stomach infection because he was having difficulty getting up in the morning, but that was declined "per DOC protocol." *Id.* Mr. Bakambia saw Mr. Plackner again on February 12th with a headache complaint and concerns about the ECG/EKG test from the November 6, 2019 ER visit. Pl.'s Ex. 13(a). Mr. Plackner reviewed the ER note with Mr. Bakabmia, "which found no cause for concern with the EKG evaluation. He did present a print out from the emergency room listing a nonspecific T-wave abnormality, and therefore, an abnormal EKG, but was based on computer analysis." *Id.* Mr. Plackner advised Mr. Bakambia that the medical doctors who reviewed the EKG readings "found no cause of concern." *Id.*

Mr. Bakambia saw Mr. Plackner again on February 24, 2020 following an incident on February 22nd. Pl.'s Ex. 13(b). Mr. Bakambia had been in the Chapel when he felt his heart was racing and he was having a headache. *Id.* "He was evaluated immediately by on-site nursing services," who contacted the physician that was on-call. *Id.* Mr. Bakambia reported experiencing some nausea, had a headache on the morning of February 24th, and expressed

a desire to see a neurologist. *Id.* On exam, Mr. Plackner found Mr. Bakambia was in no acute distress and showed a regular heart rate and rhythm. *Id.* He was able to move all his extremities equally and otherwise move with only some low back pain. *Id.* Mr. Plackner also found "[n]o neurologic deficit grossly noted" and discussed treatment possibilities with Mr. Bakambia. *Id.* Finally, Mr. Bakambia was advised that his treatment team had not seen any reason at that point for additional imaging or a referral to a specialist for a consultation. *Id.*

On March 2, 2020, Mr. Bakambia was seen again for follow-up regarding his headaches. Pl.'s Ex. 16. Mr. Plackner stated that he was "not finding any red flags on exam." *Id.* Mr. Plackner addressed two recent kites Mr. Bakambia filed, including one in which he requested to see a heart specialist and a brain specialist. *Id.* Mr. Plackner "again reinforced that there is no medical indication that he would need to see either." *Id.*

On April 21, 2020, Mr. Bakambia was seen again regarding complaints of a left-sided headache, this time by Dr. Lawrence Lorbieki. Reid Decl., Ex. 1 at 7; Pl.'s Ex. 19. Dr. Lorbieki noted that Mr. Bakambia was alert and oriented neurologically, that his cranial nerves were intact, and otherwise conducted a mostly normal exam.[7] Pl.'s Ex. 19. Dr. Lorbieki stated that he told Mr. Bakambia "his headache was muscular in nature, & I did not see anything that would suggest any intracranial abnormality." *Id.* Dr. Lorbieki believed

---

[7]    Dr. Lorbieki's notes indicated that Mr. Bakambia "does have some tenderness in the _____ temporal area which is scalp related, which he states does aggravate his headache. Does have some mild left TMJ pain to palpation, but there is no crepitus with opening and closing the mouth, and it is not necessarily more tneder with doing that." Pl.'s Ex. 19. All other exam findings were normal.

that depression may be aggravating Mr. Bakambia's symptoms and noted that he had been to see a psychologist, though he did not believe it was helpful. *Id.* He was not convinced that Mr. Bakambia had a temporomandibular joint dysfunction and gave him some exercises to do for his neck. *Id.* Dr. Lorbieki also recommended that Mr. Bakambia follow-up with psychiatry. *Id.* Mr. Plackner saw Mr. Bakambia again in May 2020 for complaints about abdominal pain and in July 2020 for concerns with his white blood cell count. Novak Aff., Ex. A at 19, 20, ECF No. 58.

Mr. Bakambia saw Mr. Plackner again on September 22, 2020, regarding complaints of daily headaches. Pl.'s Ex. 26. He again had a normal exam and Mr. Plackner advised that there were multiple medication options to consider. *Id.* Mr. Plackner stated: "since I believe he did note improvement with headaches and sleep with amitriptyline, will look at starting him on nortriptyline at 10 mg crushed every bedtime." *Id.* In a kite dated September 23, 2020, Mr. Bakambia complained that Mr. Plackner could not make a referral for mental health services, but Mr. Bakambia was seen in psychology on October 1, 2020. Pl.'s Ex. 29. During that visit he "expressed interest in a neuropsychological testing as he believes he has a TBI from assaults that occurred in MCF-RC." Pl.'s Ex. 39.

On October 9, 2020, Mr. Bakambia saw Mr. Plackner again for a follow-up regarding recent lab work. Reid Decl., Ex. 1 at 9. Mr. Bakambia was noted to have stopped taking nortriptyline after one week and it was unclear whether he was advised to do so by someone in the psychology department. *Id.* Mr. Bakambia was concerned about side-effects, including the possibility that the medicine could cause Brugada syndrome, and demanded to have an EKG. *Id.* He was also frustrated with perceived inattention to his kites and inability to get

"straight answers from anyone in health service." *Id.* His exam was mostly normal,[8] and an EKG revealed a "normal sinus rhythm with a heart rate of 88 beats per minute without ectopy." *Id.* Mr. Plackner again explained to Mr. Bakambia why there was no medical indication that a neurologist appointment would be appropriate, noted the normal CT scan results, and advised him of treatment options. *Id.* Mr. Bakambia remained "argumentative and confrontational in terms of seeing a neurologist," but agreed to think about what medications might be an option and to return in a week or so for a follow-up visit. *Id.*

### Analysis

For purposes of the following discussion, the Court assumes that Mr. Bakambia's TBI, ongoing headaches, and post-concussive syndrome constitute objectively serious medical needs. However, at this stage, the Court concludes that Mr. Bakambia has not met his heavy burden to show the Defendants acted with deliberate indifference in addressing those concerns. The medical records before the Court make it clear that the Defendants have not ignored Mr. Bakambia's diagnoses. There is no evidence that the Defendants have elected to pursue less effective treatments based on cost or some other non-medical concerns. Nor does the evidence indicate that the Defendants have intentionally delayed any necessary evaluation or treatment. Instead, the evidentiary record shows that since May 2019, the Defendants have regularly and promptly evaluated Mr. Bakambia's concerns regarding chronic headaches and other health complications. The medical records show that

---

[8]    The record for this visit indicates that Mr. Bakambia's "neutrophils remained low and had an increase in his lymphocyte count, but down from last check on 07/01/2020." Reid Decl., Ex. 1 at 9.

Dr. Shicker, Dr. Quiram, and Mr. Plackner, exercised their independent medical judgments about the best course of treatment for Mr. Bakambia's concerns.

Mr. Bakambia insists that his condition requires evaluation by a neurological specialist, and he has voiced those concerns to his medical providers and prison officials. However, the evidence demonstrates that his providers considered whether a neurological referral was medically necessary and determined that it was not. None of the medical providers who have seen Mr. Bakambia since the assault have determined that such a referral was needed. And they reached that conclusion based on Mr. Bakambia's symptoms, their medical examinations, including exams that showed no neurological deficits. Moreover, the CT scan taken at the hospital following Mr. Bakambia's loss of consciousness showed no abnormality and the medical providers determined that his electrocardiogram results were not concerning despite the indication of a nonspecific T-wave abnormality and a notation that it was an "Abnormal ECG."

Mr. Bakambia suggests that the Defendants have falsified his medical records, but the record includes no support for such an allegation. Mr. Bakambia also highlights the short duration of some of his office visits with Dr. Quiram. It is possible that spending no more than two minutes with a patient who has been diagnosed with traumatic brain injury could be consistent with a deliberate-indifference claim. However, the medical records do not confirm Mr. Bakambia's account that his encounters with Dr. Quiram were so brief, and, in any event, the evidence shows that Mr. Bakambia was seen on numerous occasions by providers other than Dr. Quiram. He was treated regularly by Mr. Plackner and had an

appointment with Dr. Shicker that was ordered by Dr. Quiram. Indeed, Mr. Bakambia's own allegations suggest that Mr. Plackner spent significant time with him during their encounters.

Mr. Bakambia asserts that he lost consciousness on November 6th and had to go to the emergency room because of the neuroleptic side effects of Topamax and possibly because of withdrawal after he went off the drug abruptly. Mr. Bakambia also criticizes the degree to which he was informed of the possible side effects Topamax, claiming that he did not give informed consent to take the medication. The record contains evidence contradicting these claims. Indeed, one of the records submitted indicates that Mr. Bakambia signed a form showing he was told he could have a negative reaction to discontinuing Topamax and he chose to cease taking the medication despite the warning. This suggests that the Defendants were not deliberately indifferent to the possible side effects of discontinuing medication abruptly. Moreover, in the time period leading up to the November 6th hospital visit, Dr. Quiram noted that Mr. Bakambia's Topamax levels were at therapeutic levels. Novak Aff., Ex. A at 1. On November 6th, Dr. Quiram promptly ordered Mr. Bakambia to be taken to the emergency room upon learning that he had lost consciousness. After the trip to the hospital, Mr. Bakambia was returned to MCF Stillwater and the hospital recommended no change to Mr. Bakambia's medication. The hospital suggested that he get rest, push fluids, and continue taking Ibuprofen or Tylenol as needed for his headaches.

Mr. Bakambia correctly asserts that his deliberate-indifference claim is not doomed to failure simply because he saw medical providers on multiple occasions. Pl.'s Reply at 5–6. Indeed, courts have consistently said that "[t]he fact that a prisoner receives some medical

care does not, by itself, defeat a claim of deliberate indifference." *See, e.g.*, *Asberry v. Wexford Health Sources, Inc.*, No. 17 C 50044, 2020 WL 30588, at *3 (N.D. Ill. Jan. 2, 2020). But the Court does not recommend denial of his motion for a preliminary injunction simply because he saw the doctors. Contrary to Mr. Bakambia's claim that the Defendants never took his medical condition seriously, the records show that they have consistently attempted to provide relief for his symptoms. They have simply disagreed with Mr. Bakambia's assessment that he needs to be evaluated by a neurologist. Such a disagreement over a course of treatment, based on independent medical judgment, is not a basis to conclude that the Defendants acted with deliberate indifference to Mr. Bakambia's medical needs. *See Tisdale v. Zaloga*, No. 1:19-cv-1022, 2020 WL 6781813, at *6 (M.D. Pa. Nov. 18, 2020) (rejecting a deliberate-indifference claim premised on failure to make a referral to a neurologist where the medical providers, exercising their independent medical judgment, determined that plaintiff's neurological complaints were unfounded).

Accordingly, Mr. Bakambia has not shown that the Defendants acted with deliberate disregard for his medical needs, and his motion for a preliminary injunction may be denied on this basis.

### B.    Irreparable Harm

The motion for a preliminary injunction should be denied for another reason— Mr. Bakambia has failed to show irreparable harm. The record simply does not support a conclusion that Mr. Bakambia faces an imminent threat to his health such that there is a clear and present need for equitable relief. Indeed, the evidence does not demonstrate that his condition has gotten worse over time, nor that it is substantially likely get worse if no

injunction is issued.[9] No objective medical evidence suggests that Mr. Bakambia is in need of immediate evaluation by a specialist to avoid likely future harm.

Rather than reflecting a showing of irreparable harm, the record indicates that Mr. Bakambia has been "examined and treated on numerous occasions" for his ongoing problems with headaches, yet he seeks further examination and treatment by a specialist. *Wheatley v. Smith*, No. 12–cv–880 (DWF/AJB), 2012 WL 5930665, at *2 (D. Minn. Oct. 25, 2012), *report and recommendation adopted*, No. 12–cv–880 (DWF/AJB), 2012 WL 5931544 (D. Minn. Nov. 27, 2012). As the court found in *Wheatley*, this is not a situation where it has been demonstrated that the request to be seen by a specialist is needed to avoid irreparable harm.

## Recommendation

Because Mr. Bakambia has failed to show a likelihood of success on the merits or that he is likely to suffer irreparable harm if no injunction issues, the Court recommends that Plaintiff's Motion for Emergency Injunction and Order to Show Cause (ECF No. 46) be **DENIED**.

Date: March 11, 2021

 *s/Katherine Menendez*
Katherine Menendez
United States Magistrate Judge

---

[9]    The Court notes that Mr. Bakambia claims his condition has gotten worse over time. Pl.'s Decl. ¶ 28. Aside from Mr. Bakambia's statements, such worsening of his condition is not documented in the record by any objective findings or other evidence.

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.