**COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Marc Amouri Bakambia, | Case No. 20-cv-1434 (NEB/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Paul Schnell, *et al.*, | |
| Defendants. | |

This matter is before the Court on the Centurion Defendants'[1] motion for summary judgment. Dkt. No. 240. The Centurion Defendants provide medical care to Minnesota prisoners under a contract with the Minnesota Department of Corrections. Dr. Quiram, Dr. Shicker, and Plackner all treated plaintiff Marc Amouri Bakambia on several occasions from mid-2019 through the present. Bakambia claims that they violated his Eighth Amendment rights by being deliberately indifferent to or deliberately disregarding his serious medical needs. Because the record shows that there is no genuine issue of material fact requiring a jury trial and the Centurion Defendants are entitled to judgment as a matter of law, the Court recommends that their motion be granted.

---

[1] As in previous orders and opinions, in this R&R the Court refers to the following Defendants collectively as the Centurion Defendants: Dr. Louis Shicker; Dr. Robert Quiram; and Brent Plackner, P.A. In Bakambia's Amended Complaint he has referred to Defendants by the numbers corresponding to his list of the parties. Dr. Shicker is referred to as "Defendant No. 6," Dr. Quiram as "Defendant No. 7," and Plackner as Defendant No. 8." Dkt. No. 117 ¶¶ 2(f), 2(g), and 2(h), 15–18.

## I.    Factual Background

On May 20 and 21, 2019, while Bakambia was serving a prison sentence at the Minnesota Correctional Facility in Rush City, MN (MCF-Rush City), three other inmates attacked him. Following the attacks Bakambia was diagnosed with fractured ribs, post-traumatic stress disorder (PTSD), traumatic brain injury (TBI), and chronic headaches. On July 17, 2019, the Minnesota Department of Corrections (DOC) transferred Bakambia to the Minnesota Correctional Facility in Stillwater, MN (MCF-Stillwater). After Bakambia arrived at MCF-Stillwater, he frequently and consistently sought medical treatment for the injuries he sustained in the assault at MCF-Rush City and for other medical issues, and was seen at several medical appointments by Plackner, Dr. Quiram, or Dr. Shicker.

On July 31, 2019, Bakambia saw Dr. Quiram and was "demanding an MRI of his brain," and in the notes from that visit, Dr. Quiram described Bakambia's course of treatment following the assault in May. Dkt. No. 64-1 at 1.[2] The notes from this encounter indicate that Bakambia had been seen at MCF-Rush City on July 3, 2019 for his headache complaints, and facial-bone X-rays taken that day were negative.[3] Though Bakambia was

---

[2] Because copies of Bakambia's medical records have been filed by the parties in connection with previous motions in this case, including his first motion for a preliminary injunction, the parties have referenced those exhibits as part of the summary judgment record, and the Court has cited to those portions of the record in this opinion. *See Birdo v. Hutchison*, No. 20-cv-1925, 2021 WL 3743521, at *5 (D. Minn. July 28, 2021) ("courts in this District have typically considered [an inmate's medical records] in deliberate indifference cases in the context of a summary judgment motion"), *report and recommendation adopted*, 2021 WL 3741484 (Aug. 24, 2021). Many of these previously filed records duplicate those filed in connection with the summary judgment papers.

[3] Dr. Quiram's July 31, 2019 encounter notes state that he had "no details of the ICS report" regarding the assault in May. Dkt. No. 64-1 at 1. A June 5, 2019 radiology interpretation indicated Bakambia sustained fractured ribs, but also showed "no radiographic evidence of acute cardiopulmonary disease." Dkt. No. 325 at 8. On July 3, 2019, before his transfer, Bakambia was seen by Clinical Nurse Practitioner Heather Ohn,

experiencing discomfort on the left side of his head, he had not reported nausea, vomiting, or problems with his equilibrium. He was diagnosed at that time with post-traumatic head injury and was prescribed Topamax. Bakambia had a follow-up appointment on July 12, 2019, when his dosage of Topamax was increased.[4] On July 19, Bakambia was prescribed Naproxen to address his continued headache complaints, but "[h]is exam at that time showed no neurological deficits."[5] Dr. Quiram found that Bakambia "does not have any neurological deficits to warrant emergent concerns for further brain imaging," and increased his dosage of Topamax. Dkt. No. 64-1 at 1.

According to Bakambia, his July 31 appointment with Dr. Quiram lasted less than two minutes and Dr. Quiram continued to disregard the issues with his left eye vision. Dkt. No. 324 ¶ 26. He also states that from July through late August of 2019, appointments with eye doctors were canceled several times. Dkt. No. 324 ¶¶ 27–28. On August 13, 2019, in an appointment with Dr. Quiram, Bakambia complained that he had not yet been seen by an optometrist, though he had been previously scheduled for it. Dkt. No. 325 at 22.

---

who diagnosed him with chronic headaches, post-traumatic head injury; prescribed him Topamax; and indicated she would refer him to an eye doctor. Dkt. No. 325 at 5.

[4] Nurse Ohn's progress note from the July 12th encounter indicates that she would "submit offsite for MRI of the brain." Dkt. No. 325 at 6.

[5] Bakambia states that his July 19, 2019 medical appointment was with Plackner, who failed to follow through on a Clinical Nurse Practitioner's order that he be seen as soon as possible by an eye doctor to address his left eye vision issues. Dkt. No. 324 ¶ 23; Dkt. No. 325 at 7 (practitioner order including "ASAP" for eye evaluation). Plackner's note from July 19, 2019 indicates that he observed no "red flags" from his examination and that he would ensure a referral to optometry occurred within "the next week or so" based on Nurse Ohn's referral order from MCF-Rush City. Dkt. No. 325 at 10; Dkt. No. 325 at 11 ("have him see onsite optometry when here next" for care of plaintiff's left eye pain).

On September 9, 2019, Bakambia saw Dr. Quiram with complaints of headaches and dizziness. Dkt. No. 77 at 1. Dr. Quiram diagnosed Bakambia with "TBI with chronic headache," found that Bakambia presented "no neurological deficit," and increased Bakambia's dosage of Topamax to 100 mg twice a day. He agreed to place Bakambia on a "second tier" restriction to address his concerns about falling. A month later, Dr. Quiram saw Bakambia again for continued issues with headaches, dizziness, fatigue, and mood swings. Due to the "persistence with his complaints" Dr. Quiram indicated he would request an MRI of Bakambia's head and would have him see Dr. Shicker. Dkt. No. 77 at 1.

On October 15, 2019, Bakambia went to the pill window at MCF-Stillwater's Health Services area and requested his prescription medications—Topamax and Naproxen. However, he avers that he was given a strong dose of a neuroleptic drug by DOC Defendant Lori Lewis instead of his usual medication. After taking the medication, Bakambia felt strange, talkative, and out of control of his speech. He experienced shifts in his emotions and a throbbing pain in the "back of his brain." These side effects were unlike anything he experienced when taking Topamax or Naproxen. Dkt. No. 324 ¶ 34. Bakambia requested a lab workup to see what medication he was given on October 15, but DOC personnel told him to wait for an upcoming appointment with Dr. Shicker. Dkt. No. 324 ¶ 37; Dkt. No. 325-1 at 27. Bakambia was told that lab orders needed to come from a medical provider, but neither Dr. Quiram nor Plackner, who were "physically present in the clinic," ordered the lab work. Dkt. No. 324 ¶ 38. On October 21, 2019, DOC records indicate that Bakambia elected to discontinue Topamax and Naproxen. Dkt. No. 77 at 5.

On October 24, 2019, Bakambia was in the clinic at MCF-Stillwater and was informed about an upcoming appointment with Dr. Shicker. Dkt. No. 77 at 6. He expressed concerns about the medication he had been given on October 15, asked to have a lab workup, and requested information about the half-life of Topamax. Dkt. No. 77 at 6. Bakambia's Medication Administration Record (MAR) for October 2019 indicates that he missed his dosage of Topamax on October 15, 2019. Dkt. No. 325 at 31. However, DOC Defendant Monica Arons indicated in a note responding to Bakambia's October 23, 2019 kite concerning the medication he received on October 15 that she "verified via paper MAR [that Bakambia] took Topamax and Naproxen at the 1030 pill run as ordered by Dr. Quiram." Dkt. No. 77 at 6.

On November 6, Bakambia was taken to an emergency room after he was found lying in front of his cell. Dkt. No. 77 at 2. The ER notes indicated he was fluttering his eyes and moving his head around complaining of a headache and neck pain. Dkt. No. 77 at 2. Bakambia could not recall what happened, was unable to state what day of the week it was, but knew he was in MCF-Stillwater. Dkt. No. 77 at 6. Dr. Quiram was notified about the incident and gave the order for Bakambia to go to the ER. Dkt. No. 77 at 7. A CT scan showed "no evidence of acute hemorrhage or other acute intracranial abnormality." Dkt. No. 77 at 7. A HealthPartners note from an ECG test on November 6, 2019 includes the following notation:

> Sinus rhythm
> Nonspecific T wave abnormality
> Abnormal ECG
> No previous ECGs available

Dkt. No. 77 at 12. Other HealthPartners records document the treatment Bakambia received at the emergency room. Dkt. No. 77 at 38–62.[6]

Bakambia asked HealthPartners for information regarding his ER visit on November 6, 2019. Dkt. No. 324 ¶ 50. Among the information he received was a record prepared by attending provider, Dr. Jennifer Boklewski. The ER records include a reference to "[u]nderdosing of other antiepileptic and sedative hypnotic drugs, initial encounter." Dkt. No. 325-1 at 20[7]. Dr. Boklewski's narrative description of her encounter with Bakambia and review of the tests does not mention this reference to underdosing of medication. Dkt. No. 77 at 48–49. Topiramate, the generic name for Topamax, is an antiepileptic drug often used to treat migraine headaches, with a known side effect of sedation. Drug Facts & Comparisons, *Topiramate Oral* (Dec. 30, 2021), http://fco.factsandcomparisons.com/lco/action/doc/retrieve/docid/fc_dfc/5549442#uses-nested-0 (last visited January 5, 2022).

On November 7, 2019, Plackner saw Bakambia for a follow-up appointment following his ER visit the previous day. Dkt. No. 77 at 2. Bakambia told Plackner that he felt he was doing worse on the Topamax, stated that he had no history of headaches before the assault in May, and denied nausea or vomiting. Dkt. No. 77 at 2. Plackner

---

[6] These records show, among other things, no signs of Brugada syndrome following the November 6, 2019 emergency room visit. Dkt. No. 58 at 4. Brugada syndrome "is a rare, but potentially life-threatening heart rhythm disorder that is sometimes inherited." Mayo Clinic, Brugada syndrome, https://www.mayoclinic.org/diseases-conditions/brugada-syndrome/symptoms-causes/syc-20370489 (last visited January 14, 2022); *see also* Dkt. No. 77-1 at 8–9 (discussing Brugada syndrome as a heart problem that has shown up in some people taking Nortriptyline); Dkt. No. 77-1 at 10–13 (Mayo Clinic web page printout). Emergency department records demonstrate that abnormal heart rhythm was not detected and was not suspected to be the cause of the syncopal event. Dkt. No. 77 at 48.

[7] A more legible copy of this document is found at page 52 of docket entry 77.

noted that Bakambia discontinued his Topamax himself prior to the November 6 incident.[8] Dkt. No. 77 at 2. Plackner advised Bakambia "that medications like the Topamax can have rebound ramifications if they are discontinued abruptly, which may be a part of what happened yesterday." Dkt. No. 77 at 2. He also noted that Bakambia drinks coffee. Dkt. No. 77 at 2. Bakambia agreed to take Tylenol for an acute headache, and Plackner started him on Amitriptyline at bedtime to improve sleep and reduce the frequency of the headaches. Dkt. No. 77 at 2.

Plackner saw Bakambia again on November 13, 2019 for continued complaints of headaches and to address Bakambia's trouble sleeping. Dkt. No. 77 at 19. Plackner's examination revealed no photophobia, and he found Bakambia was not in any acute distress. Plackner determined that Bakambia should continue to drink fluids, and reminded him that he should take Tylenol as needed and that he could purchase Naproxen, ibuprofen, or Excedrin from the canteen. Plackner recommended Excedrin, requested an optometry appointment, continued Amitriptyline, and agreed to see Bakambia in a month or sooner if his symptoms changed. Dkt. No. 77 at 19.

On December 4, 2019, Bakambia saw Dr. Shicker on a referral regarding headaches and "visual disturbances." Dkt. No. 77 at 20. Bakambia reported to Dr. Shicker that a physician at MCF-Rush City told Bakambia he suffered a TBI during the May 2019 assault and that he was having headaches and trouble focusing since the incident. Bakambia reported experiencing some nausea with his headaches, but there was no documented vomiting. Dr. Shicker found Bakambia was in no acute distress on exam and

---

[8] On October 21, 2019, Bakambia signed a notice indicating that he was refusing Topamax and Naproxen and acknowledged that doing so may risk an increase in his headache symptoms. Dkt. No. 77 at 5.

that his pupils were "equal, round, reactive to light & accommodation." Further, Dr. Shicker noted: the extraocular muscles were intact; no papilledema; intact cranial nerves; normal gait; motor and sensory of upper and lower extremities were within normal limits; no motor shift; no nystagmus; and symmetrical reflexes. It was Dr. Shicker's impression that Bakambia had "prolonged post concussive syndrome" and he doubted there was a new history of migraine headaches. Dr. Shicker also noted the normal findings after the November 6, 2019 ER visit, including the normal CT scan and an EKG test. With the negative CT results and the likely post concussive syndrome, Dr. Shicker told Bakambia "that the best thing for him to do is to try to get into a routine to exercise when he can and to try to go to bed at the same time and wake up at the same time regardless of how much sleep he had, to try to exercise daily and to eat as regularly as he can." Dr. Shicker was inclined to discontinue his Amitriptyline and planned to double check for other, more recent recommended treatments for post concussive syndrome. Dr. Shicker noted that Bakambia's sentence would not be concluded for another 12 years and stated: "if he does not have some improvement within the next several months he may need a further evaluation with a possible neurology consultation, but for now I do not think that this is indicated." Bakambia said he understood Dr. Shicker's explanation, but was noted to be "somewhat frustrated by no quick fixes." Dkt. No. 77 at 20.

Bakambia lost consciousness and fell in his cell during the afternoon of January 10, 2020. Dkt. No. 324 ¶ 64. Earlier that day, Bakambia had an appointment with Plackner for "evaluation of fatigue, headaches, nausea, and neck pain." Dkt. No. 325-1 at 33. Plackner again reassured Bakambia that he and others found "no red flags of concern regarding his symptoms," referenced normal examination findings, and provided

suggestions for how Bakambia might find some relief from his headaches. Dkt. No. 325-1 at 33; Dkt. No. 324 ¶ 63. A DOC incident report indicates that Bakambia was found face down in his cell, and after speaking with a corrections officer, Bakambia was taken by a DOC nurse to Health Services. Dkt. No. 325-1 at 34. According to this report, an "on-site provider was made aware of his fall." Dkt. No. 325-1 at 34.

Plackner saw Bakambia again on February 10, 2020 to discuss recent lab work and a diagnosis of a helicobacter pylori ("H. pylori") infection. Dkt. No. 77 at 22; Dkt. No. 324 ¶ 73. Bakambia wanted to change the times he was supposed to receive medication to treat this stomach infection because he was having difficulty getting up in the morning, but that was declined "per DOC protocol." Dkt. No. 77 at 22. Bakambia saw Plackner again on February 12 with a headache complaint and concerns about the ECG/EKG test from his November 6, 2019 ER visit. Dkt. No. 77 at 23; Dkt. No. 324 ¶ 74. Plackner reviewed the ER note with Bakambia, "which found no cause for concern with the EKG evaluation. He did present a printout from the emergency room listing a nonspecific T-wave abnormality, and therefore, an abnormal EKG, but was based on computer analysis." Plackner advised Bakambia that the medical doctors who reviewed the EKG readings "found no cause of concern." Dkt. No. 77 at 23.

Bakambia saw Plackner again on February 24, 2020 following an incident on February 22. Dkt. No. 77 at 24; Dkt. No. 324 ¶ 76. Bakambia had been in the Chapel when he felt his heart was racing and he was having a headache. "He was evaluated immediately by on-site nursing services," who contacted the physician that was on-call. Bakambia reported experiencing some nausea, had a headache on the morning of February 24, and expressed a desire to see a neurologist. On exam, Plackner found

Bakambia was in no acute distress and showed a regular heart rate and rhythm. He was able to move all his extremities equally and otherwise move with only some low back pain. Plackner also found "[n]o neurologic deficit grossly noted" and discussed treatment possibilities with Bakambia. Finally, Bakambia was advised that his treatment team had not seen any reason at that point for additional imaging or a referral to a specialist for a consultation. Dkt. No. 77 at 24.

On March 2, 2020, Bakambia was seen again for follow-up regarding his headaches. Dkt. No. 77 at 27; Dkt. No. 325-1 at 42. Bakambia complained that he felt something was "ripping inside of his stomach when lying down," and Plackner noted this in his records. Dkt. No. 324 ¶ 81. Plackner stated that he was "not finding any red flags on exam." Plackner addressed two recent kites Bakambia filed, including one in which he requested to see a heart specialist and a brain specialist. Plackner "again reinforced that there is no medical indication that he would need to see either." Dkt. No. 77 at 27.

Bakambia saw Plackner on April 7, 2020 because he was experiencing ongoing stomach pain and headaches. Dkt. No. 324 ¶ 83. Plackner noted that Bakambia had previously completed treatment for positive H. pylori in February of 2020, but had not yet collected a post-treatment stool test, so he provided Bakambia with supplies to collect a stool sample and planned to follow up once the results were received. Dkt. No. 325-1 at 43. Plackner later observed that the results of the test for H. pylori stool antigen were negative. Dkt. No. 325-1 at 44. Bakambia believes Plackner should have done additional analysis. Dkt. No. 324 ¶ 83.

On April 21, 2020, Bakambia was seen again regarding complaints of a left-sided headache, this time by Dr. Lawrence Lorbieki. Dkt. No. 64-1 at 7; Dkt. No. 77 at 31.

Dr. Lorbieki noted that Bakambia was alert and oriented neurologically, that his cranial nerves were intact, and otherwise conducted a mostly normal exam.[9] Dkt. No. 77 at 31. Dr. Lorbieki stated that he told Bakambia "his headache was muscular in nature, & I did not see anything that would suggest any intracranial abnormality." Dr. Lorbieki believed that depression may be aggravating Bakambia's symptoms and noted that he had been to see a psychologist, though he did not believe it was helpful. He was not convinced that Bakambia had a temporomandibular joint dysfunction and gave him some exercises to do for his neck. Dr. Lorbieki also recommended that Bakambia follow up with psychiatry. Dkt. No. 77 at 31; Dkt. No. 324 ¶ 84.

Plackner saw Bakambia again in May 2020 for complaints about abdominal pain and in July 2020 for concerns with his white blood cell count. Dkt. No. 58 at 19–20. Following an appointment on May 29, 2020, Plackner ordered a complete blood count (CBC) test and indicated another should be performed in a month. Dkt. No. 324 ¶ 88; Dkt. No. 325-1 at 52. Bakambia had an abnormal CBC test on July 1, 2020, and on July 31, 2020, Plackner diagnosed him with mild leukopenia, likely related to a benign ethnic neutropenia syndrome. Dkt. No. 324 ¶ 88; Dkt. No. 325-1 at 53. However, Plackner "did not document[] the cause of Plaintiff's neutropenia." Dkt. No. 324 ¶ 88.

Bakambia saw Plackner again on September 22, 2020, regarding complaints of daily headaches. Dkt. No. 77-1 at 2. He again had a normal exam and Plackner advised that there were multiple medication options to consider. Plackner stated: "since I believe

---

[9] Dr. Lorbieki's notes indicated that Bakambia "does have some tenderness in the _____ temporal area which is scalp related, which he states does aggravate his headache. Does have some mild left TMJ pain to palpation, but there is no crepitus with opening and closing the mouth, and it is not necessarily more tender with doing that." Dkt. No. 77 at 31 (blank appears in the original). All other exam findings were normal.

he did note improvement with headaches and sleep with amitriptyline, will look at starting him on nortriptyline at 10 mg crushed every bedtime." Dkt. No. 77-1 at 2; Dkt. No. 324 ¶¶ 89–90. In a kite dated September 23, 2020, Bakambia complained that Plackner could not make a referral for mental health services, but Bakambia was seen in psychology on October 1, 2020. Dkt. No. 77-1 at 6. During that visit Bakambia "expressed interest in a neuropsychological testing as he believes he has a TBI from assaults that occurred in MCF-RC." Dkt. No. 77-1 at 25.

On October 9, 2020, Bakambia saw Plackner again for a follow-up regarding recent lab work. Dkt. No. 64-1 at 9. Bakambia was noted to have stopped taking nortriptyline after one week and it was unclear whether he was advised to do so by someone in the psychology department. Bakambia was concerned about side effects, including the possibility that the medicine could cause Brugada syndrome, and demanded to have an EKG. He was also frustrated with perceived inattention to his kites and inability to get "straight answers from anyone in health service." His exam was mostly normal,[10] and an EKG revealed a "normal sinus rhythm with a heart rate of 88 beats per minute without ectopy." Plackner again explained to Bakambia why there was no medical indication that a neurologist appointment would be appropriate, noted the normal CT scan results, and advised him of treatment options. Bakambia remained "argumentative and confrontational in terms of seeing a neurologist," but agreed to think about what medications might be an option and to return in a week or so for a follow-up visit. Dkt. No. 64-1 at 9. Bakambia discussed abnormalities in his neutrophils, and Plackner "stated

---

[10] The record for this visit indicates that Bakambia's "neutrophils remained low and had an increase in his lymphocyte count, but down from last check on 07/01/2020." Reid Decl., Ex. 1 at 9.

that the white blood cell[s] were normalized, but . . . diagnosed Plaintiff with neutropenia, which is a condition related to a low number of neutrophils that is another type of white blood cell … and wouldn't tell Plaintiff the cause of this neutropenia." Dkt. No. 324 ¶ 91; *see also* Dkt. No. 325-1 at 67–69 (excerpts from *The Merck Manual of Medical Information* discussing neutropenia).

Between October 2020 and early January 2021, Bakambia received medical care on several occasions from providers other than the Centurion Defendants. Dkt. No. 126-1. Bakambia was diagnosed with COVID-19 on October 20, 2020. Dkt. No. 126-1 at 17. On October 26, while Bakambia was infected with the virus that causes COVID-19, he was seen in sick call for complaints of chest pain, productive cough, fatigue, and muscle spasms. His request for an X-ray was passed along, but the following day it was deemed than additional imaging was not warranted. Dkt. No. 126-1 at 24. On December 12, 2020, he was diagnosed with a likely upper respiratory infection and EKG testing was performed given Bakambia's complaints of chest pain. Dkt. No. 126-1 at 26. On December 14, 2020, Bakambia saw Dr. Thomas Blankenship for continued complaints of chest pain and a productive cough. Dr. Blankenship noted that Bakambia's symptoms all started about six weeks earlier when he was diagnosed with COVID-19 and reviewed the December 12 EKG results with Bakambia, noting no acute changes. He diagnosed Bakambia with a possible inflammation of the cartilage connecting the ribs to the sternum (costochondritis) or chest wall pain, prescribed a warm pack for the chest and ibuprofen, and told Bakambia to follow up if his symptoms worsen. Dkt. No. 126-1 at 21.

On December 30, Bakambia was seen by Clinical Nurse Practitioner Christine Fossum for complaints of lung pain, brain discomfort, and sinus pain. Dkt. No. 126-1 at

17. She noted that Bakambia had been seen for similar complaints on December 14 and that an EKG showed no acute findings. Bakambia raised concerns that the nonspecific T-wave abnormality present in the recent results was the same thing that had been there since his EKG in November 2019, and that this condition was simply ignored. For Bakambia's nasal congestion and headache, Nurse Fossum ordered saline nasal spray, and noted that he had been prescribed a Z-PAK on December 10. Dkt. No. 126-1 at 17. Nurse Fossum also ordered a chest X-ray and advised Bakambia that most likely his pain symptoms were related to his recent COVID diagnosis. Dkt. No. 126-1 at 18. The onsite physician noted that he saw nothing concerning in the EKG and would follow up with Bakambia the following week. Dkt. No. 126-1 at 18.

On January 6, 2021, Bakambia was seen by Plackner and DOC Defendant Monica Arons. Dkt. No. 324 ¶ 13; Dkt. No. 324-2 at 52–53. Bakambia presented with complaints of "severe pain on his upper quadrants, chest pain, and pain and discomfort in his brain including pain and discomfort in his stomach." Dkt. No. 324 ¶ 13. Plackner administered a spirometry test "that caused piercing pain in Plaintiff's brain and chest," and told Bakambia that the test had been ordered by Dr. Jay Bauder. Dkt. No. 324 ¶ 13; Dkt. No. 324-2 at 54. Plackner noted that the recent chest X-ray ordered by Nurse Fossum showed "no radiographically evident acute cardiopulmonary process," and that the December 10 EKG showed "normal sinus rhythm [and] nonspecific T-wave abnormality of no consequence." Dkt. No. 324-2 at 52. Bakambia "became somewhat upset that [Plackner] was still seeing him for these issues." Dkt. No. 324-2 at 52. Later that day, Bakambia asked to be seen by different medical providers in the future. Dkt. No. 324 ¶ 14; Dkt. No. 324-2 at 55. Bakambia received a note on January 6, 2021, from Nurse Fossum

again noting that recent EKG results presented no concerns, despite the presence of a nonspecific T-wave abnormality, which is not indicative of a heart disease. Dkt. No. 126-1 at 19.

On January 16, 2021, Bakambia was taken to the HealthPartners emergency room for several issues including migraines, chest pain, and upper quadrant pain. Dkt. No. 324 ¶ 15; Dkt. No. 324-2 at 58–69. Dr. Matthew Bogan performed an X-ray that showed gas-filled loops of bowel in the left upper quadrant, and an EKG showed heart arrhythmia and a non-specific T-wave abnormality. Dkt. No. 324 ¶ 15; Dkt. No. 324-2 at 72–82. Dr. Bogan's physical exam was unremarkable, he concluded that Bakambia's EKG results were consistent with an earlier EKG test, and found that another CT test was not indicated based on the neurological exam. Dkt. No. 324-2 at 73–74. However, Dr. Bogan's notes state: "[w]ill place referral to neurology for assistance in headache control." Dkt. No. 324-2 at 75. Dr. Bogan prescribed Tylenol, Lidocaine, and ibuprofen, but the Centurion Defendants did not provide Bakambia these medications. Dkt. No. 324 ¶¶ 15–16; Dkt. No. 324-2 at 69–71. Bakambia also did not have a follow-up visit with his primary care provider to discuss the neurology referral. Dkt. No. 324 ¶ 16.

Bakambia continued to receive medical care throughout 2021. On September 15, 2021, Bakambia had a medical appointment concerning, among other things, his ongoing complaints of abdominal pain, and the plan was to obtain additional laboratory studies. Dkt. No. 315-1 at 12–13. His symptoms of stomach pain persisted until, on October 5, 2021, an ultrasound revealed a possible hernia and kidney stones. Centurion provider Dr. Stephen Craane requested the ultrasound. The impression suggested further

evaluation may be needed to diagnose the presence of kidney stones and, if appropriate, a CT scan may be necessary to diagnose a hernia. Dkt. No. 315-1 at 2.

On September 15, 2021, Dr. Craane also saw Bakambia for headache concerns. Dr. Craane recorded Bakambia's complaints of daily headaches. Dr. Craane noted Bakambia's statement that he had been told he should see a neurologist during a November 6, 2019 ER visit. Dr. Craane diagnosed Bakambia with "headaches, persistent, potential mixed type," prescribed a trial of verapamil because Elavil had been ineffective, and instructed Bakambia to notify medical staff if he experienced further difficulties. Dkt. No. 315-1 at 12–13.

On October 1, 2021, Bakambia saw Dr. Craane in sick call, again raising complaints of headaches. Bakambia also explained that the verapamil trial had been ineffective, that he experienced episodes of lightheadedness on the medication, and he was concerned that it could cause cardiac issues. Bakambia "voice[d] considerable interest in undergoing evaluation per a neurologist." Dr. Craane's note indicates that the treatment plan was as follows: "elect to file for a neurology evaluation for patient's headaches." Dkt. No. 315-2 at 13–14. Bakambia asked Dr. Craane how this was different from any suggestion that neurology consultation was "elective," and Dr. Craane told him the "elect to file" language was more likely to result in a trip to neurology for evaluation within the next two months. Dkt. No. 314 at 11; Dkt. No. 315 at 2; *see also* Dkt. No. 323 at 11 (arguing that the Centurion Defendants have now admitted Plaintiff needs to see a neurologist).

## II.    Summary Judgment Standard

A movant is entitled to summary judgment where "no genuine dispute as to any material fact [exists] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where no reasonable jury could find in favor of the non-movant, there is no genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are only those "that might affect the outcome of the suit under the governing law." *Id.* Where there is a genuine dispute of facts, those facts should be viewed in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id.*

The moving party must first "identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). It can satisfy its burden either by demonstrating evidence that negates an essential element of the non-movant's case or by showing that insufficient evidence exists to support the non-moving party's case. *Id.* Once the moving party has satisfied its initial burden, the responsibility shifts to the non-moving party to submit evidence of "specific facts showing the presence of a genuine issue for trial." *Id.* (citing *Torgerson*, 643 F.3d at 1042). In doing so, "[a non-moving party] may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor without resort to

17

speculation, conjecture, or fantasy." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) (quotations and citations omitted); *see also Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) ("[a] properly supported motion for summary judgment is not defeated by self-serving affidavits." (quoting *Bacon v. Hennepin Cty. Medical Center*, 550 F.3d 711, 716 (8th Cir. 2008)).

## III.  Discussion

The Centurion Defendants assert that there are no genuine issues of material fact and they are entitled to judgment as a matter of law on Bakambia's Eighth Amendment deliberate indifference claims against them. For the reasons that follow, the Court recommends that their motion be granted.

### A.  Deliberate Indifference Standards

The Eighth Amendment prohibits "cruel and unusual punishments." *Estelle v. Gamble*, 429 U.S. 97, 101–02 (1976). This standard requires each State "to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. Prison officials violate the Eighth Amendment when "they commit 'acts or omissions sufficiently harmful to evidence deliberate indifference to [an inmate's] serious medical needs.'" *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting *Estelle*, 429 U.S. at 106). In this context, a plaintiff must show "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

A deliberate indifference claim based on a failure to provide treatment requires an inmate to establish that "prison officials knew that the condition created an excessive

risk to the inmate's health and then failed to act on that knowledge." *Dulany*, 132 F.3d at 1239. "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoners' serious medical needs." *Id.* (citing *Estelle*, 429 U.S. at 104–05). Mere negligence, however, is not enough to demonstrate a constitutional violation. *Id.* (citing *Estelle*, 429 U.S. at 106). "This subjective standard is 'akin to that of criminal recklessness,' requiring more than negligence." *De Rossitte v. Correct Care Solutions, LLC*, No. 20-1432, 2022 WL 90203, at *2 (8th Cir. Jan. 10, 2022) (quoting *Blair v. Bowersox*, 929 F.3d 981, 987–88 (8th Cir. 2019)).

It is not enough for a prisoner to simply argue that a different course of care would be more effective. Courts have repeatedly noted that a prisoner's "difference of opinion over matters of expert medical judgment or a prescribed course of medical treatment fails to state a federal constitutional question." *See, e.g.*, *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir. 1981).

This does not mean that a deliberate indifference claim can never be successful simply because a prisoner has received some care. Indeed, "a total deprivation of care is not a necessary condition for finding a constitutional violation: 'Grossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment.'" *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). A defendant may also be liable for intentionally delaying access to medical care.

*Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015) (citing *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002)).

### B.    Deliberate Indifference Analysis

The Centurion Defendants do not seek summary judgment on the objective prong of Bakambia's Eighth Amendment claims. Instead, they argue that summary judgment is appropriate because Bakambia has presented no evidence to support the subjective prong. Dkt. No. 241 at 7–13. The Court agrees that there is no genuine issue of material fact and the Centurion Defendants are entitled to judgment as a matter of law. The record contains no evidence from which a reasonable jury could conclude that Dr. Shicker, Dr. Quiram, or PA Plackner deliberately disregarded Bakambia's serious medical needs.

Bakambia's medical records reveal that Dr. Quiram, Dr. Shicker, and Plackner saw Bakambia in the prison clinic many times following his transfer to MCF-Stillwater, addressed and documented his health complaints, reviewed his available medical history, considered the course of treatment and its relative effectiveness, and exercised their independent medical judgment in determining the best course of ongoing treatment. Because it is undisputed that the Centurion Defendants provided Bakambia care for his complaints, to show deliberate indifference in the "level of care provided," he must point to evidence from which a reasonable juror could conclude that his treatment was "grossly incompetent or inadequate," that the Centurion Defendants chose "to take an easier and less efficacious course of treatment, … or showing a defendant intentionally delayed or denied access to medical care." *Allard*, 779 F.3d at 772. Bakambia is "entitled to prove his case by establishing the course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference." *Id.* (cleaned up).

Bakambia has not pointed to any evidence that establishes the care he received was grossly incompetent, that the Centurion Defendants chose easier and less effective treatments, or intentionally delayed or denied access to medical care, nor has he demonstrated they deviated dramatically from any applicable professional standards, if they deviated at all. Bakambia's arguments to the contrary do not alter this conclusion.[11]

### 1. Neuroleptic Drugs

Bakambia claims that the Centurion Defendants violated his Eighth Amendment rights because, instead of his prescribed medications, Topamax and Naproxen, he was administered a neuroleptic drug on October 15, 2019, which caused him to have a syncopal episode on November 6, 2019. Dkt. No. 323 at 3–5, 6. However, Bakambia fails to present a genuine issue for trial on this theory for several reasons, not the least of which is the absence of evidence that he was, in fact, administered the improper medication.

Summary judgment for the Centurion Defendants is appropriate on this claim because Bakambia has presented no evidence that any of the Centurion Defendants actually administered the medications he received on October 15, 2019. In fact, he has alleged that a DOC official, Lori Lewis, gave him the wrong medication, and there is no indication that the Centurion Defendants controlled or directed whatever medications Lewis provided. Absent some evidence that the Centurion Defendants were responsible for the conduct that he claims injured him, there is no genuine issue for trial. *See*

---

[11] Throughout his response to the Centurion Defendants' motion, Bakambia asserts that they did not properly respond to discovery requests, withheld documents, and otherwise engaged in improper litigation conduct. None of these arguments demonstrates the existence of a fact issue for trial, nor warrants additional discussion.

*Rosenberg ex rel. Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995) (requiring a plaintiff alleging a deliberate indifference claim under § 1983 to specify how defendants were personally involved in, or had responsibility for, incidents that injured him).

Further, summary judgment is appropriate here because Bakambia has not pointed to evidence creating a genuine fact dispute over whether the administration of any particular medication caused him to lose consciousness on November 6, 2019. Bakambia references his October 2019 MAR, indicating that he missed his dosage of Topamax on October 15. He also references a November 6 note from the Lakeview Hospital ER physician Dr. Boklewski diagnosing an underdosing of an antiepileptic and sedative hypnotic drug. Contrary to Bakambia's claims, the MAR does not provide evidence that he was given a neuroleptic drug. Dr. Boklewski did not state or even hint that Bakambia had been given a neuroleptic medication that caused him to have a near syncopal event. The evidence, even taken in the light most favorable to Bakambia, supports an inference that his November 6, 2019 incident was attributable to his abrupt discontinuation of Topamax on October 21. Topamax is an antiepileptic drug with a sedative side effect. Thus, the reasonable interpretation of Dr. Boklewski's ER record is that she believed Bakambia's syncopal event was attributable to his failure to taper off of Topamax more gradually than he did. This reading is further supported by the record of a medical appointment Bakambia had with P.A. Plackner on November 7, 2019, indicating that Plackner suspected the abrupt discontinuation of Topamax may have contributed to the November 6th incident and ER visit. Under these circumstances, a reasonable jury

could not conclude that any Centurion Defendant was responsible for his ER visit due to administration of neuroleptic medication.[12]

Bakambia also suggests that an October 21 and 24, 2019, when he complained of the allegedly improperly administered neuroleptic drug's side effects to DOC personnel and requested labs be performed, the Centurion Defendants were at the prison, knew of his requests and reported symptoms, and should have ordered lab work to discover what medication he had given. Dkt. No. 323 at 3, 17. However, Bakambia offers nothing other than his own speculation that the Centurion Defendants knew, or were given information from which they could have, and did, infer he had been given the wrong medication, that it was responsible for the symptoms he experienced, or that lab work would have revealed the specific medication he had taken on October 15. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Nor does Bakambia offer any evidence to suggest that failing to order lab work under these circumstances so deviated from the

---

[12] Bakambia suggests that the absence of any mention of Dr. Boklewski's diagnosis of underdosing of an antiepileptic drug in medical records prepared by the Centurion Defendants after his trip to the ER in November 2019 indicates a deliberate disregard of the need to keep accurate medical records. Dkt. No. 323 at 4–5. Although Bakambia accurately cites *Burks v. Teasdale*, 492 F. Supp. 650 (W.D. Mo. 1980), for the proposition that grossly inadequate maintenance of medical records runs afoul of the constitutional requirement that states must provide their inmates adequate medical care, there is no evidence in this record remotely comparable to the shoddy record keeping at issue in *Burks*. *Id.* at 660–65 (discussing extensive expert testimony regarding the problems with the prison's medical record keeping); *id.* at 676 (reasoning that the grossly inadequate medical record maintenance was unconstitutional because it interfered with the ability to provide a proper continuity of care).

appropriate professional standards that a decision not to do so would constitute deliberate indifference.

Relatedly, Bakambia contends that his Eighth Amendment rights were violated when he was administered the unidentified neuroleptic drug on October 15 without his informed consent.[13] Dkt. No. 323 at 4, 14. The Centurion Defendants are entitled to summary judgment on this claim because, again, Bakambia has presented no evidence to indicate that Dr. Shicker, Dr. Quiram, or P.A. Plackner were involved in the alleged administration of the wrong medication on October 15. The cases Bakambia cites are inapplicable—there is no evidence in this case that the Centurion Defendants (or any Defendant, for that matter) forcibly administered any antipsychotic drugs. *Riggins v. Nevada*, 504 U.S. 127 (1992) (concluding that it was reversible error for the state court to forcibly administer antipsychotic drugs to a murder defendant during the trial without considering less intrusive alternatives and other factors); *Bee v. Greaves*, 744 F.2d 1387 (10th Cir. 1984) (reversing entry of summary judgments for defendants where there was a genuine issue as to whether an emergency justified forcibly medicating the plaintiff indefinitely); *United States v. Bryant*, 670 F. Supp. 840 (D. Minn. 1987) (concluding that the government could not forcibly administer antipsychotic medication to the respondent unless there was an emergency or an adjudication that he was incompetent).

Finally, Bakambia argues that Dr. Quiram was deliberately indifferent to his serious medical needs because he did not personally respond to Bakambia's loss of

---

[13] Bakambia does not appear to be claiming that he made the decision to discontinue Topamax on October 21, 2019 without being advised of the potential negative effects of doing so without tapering off of the medication. However, the Court notes that Bakambia signed off on a form indicating that he had received an explanation of the potential risks of refusing his medication.

consciousness on November 6, 2019 and, "instead he sat in his office . . . . Then he call[ed] in on 11-07-19 and 11-08-19" [Dkt. No. 323 at 22], to intentionally avoid being the physician to "follow-up with Plaintiff after his return from the ER." Dkt. No. 324 ¶ 46. The undisputed evidence in the record shows that Dr. Quriam did, in fact, respond to the November 6 incident and gave an order for Bakambia to be taken to the ER. Dkt. No. 325 at 28–29 (progress notes for Nov. 6, 2019). Bakambia has not pointed to any evidence beyond his own conjecture that Dr. Quiram changed which days he would come in to the prison to avoid following up with Bakambia after his ER visit.

For all these reasons, the Centurion Defendants are entitled to summary judgment on the claims arising out of Bakambia's allegations that he was improperly administered neuroleptic medication on October 15, 2019.

### 2. Headache Treatment

Bakambia's primary complaint regarding the Centurion Defendants' response to his persistent headaches has been that they should have referred him to a neurologist. He argues that because he was transferred to MCF-Stillwater in July 2019 with diagnoses of traumatic brain injury and post-traumatic stress disorder, the Centurion Defendants should have referred him to a specialist for evaluation and treatment. However, Bakambia has not pointed to, and the Court has not found in the record, any evidence that could allow a reasonable jury to find the Centurion Defendants were deliberately indifferent to his headache complaints. The Court thoroughly examined Bakambia's medical records from July 2019 through October 2020 that related to his headache treatment in a Report and Recommendation dated March 11, 2021. It summarized the evidentiary record as follows:

> The medical records before the Court make it clear that the Defendants have not ignored Mr. Bakambia's diagnoses. There is no evidence that the Defendants have elected to pursue less effective treatments based on cost or some other non-medical concerns. Nor does the evidence indicate that the Defendants have intentionally delayed any necessary evaluation or treatment. Instead, the evidentiary record shows that since May 2019, the Defendants have regularly and promptly evaluated Mr. Bakambia's concerns regarding chronic headaches and other health complications. The medical records show that Dr. Shicker, Dr. Quiram, and Mr. Plackner, exercised their independent medical judgments about the best course of treatment for Mr. Bakambia's concerns.

Dkt. No. 142 at 18–19.

The record before the Court on the Centurion Defendants' motion for summary judgment has not changed, and the same analysis applies here. The undisputed evidence shows that the Centurion Defendants provided significant treatment for Bakambia's headache complaints, prescribing various medications and adjusting doses to accommodate his feedback on their relative efficacy. Although Bakambia continued to press for a referral to a specialist, the Centurion Defendants repeatedly evaluated his complaints, his medical history, and the results of various tests. Each time they did so, they found that a referral to a neurologist was not indicated. If they were wrong about this, it would at most demonstrate that they acted negligently in treating his headaches, but negligence is insufficient to establish a deliberate indifference claim.

Bakambia argues that the Centurion Defendants' improper handling of his headache complaints is evidenced by the fact that at a January 16, 2021 ER visit, Dr. Matthew Bogan diagnosed him with headache syndrome and made a referral to a neurologist. Dkt. No. 324 ¶ 15 (citing 324-2 at 58–82). In October 2021, Dr. Stephen Craane also indicated that Bakambia should be referred to a neurologist. Dkt. No. 315-2 at 13–14. These records do not supply evidence that the Centurion Defendants were

deliberately indifferent to Bakambia's headache complaints.[14] Neither Dr. Bogan's nor Dr. Craane's recommendation for a neurology referral creates a genuine issue of material fact regarding the care provided for Bakambia's headaches by Dr. Shicker, Dr. Quiram, or P.A. Plackner. The January 16, 2021 after-visit summary and Dr. Craane's October 1, 2021 Medical Progress Notes do not state or imply that Bakambia's prior treatment failed to meet professional standards or was so lacking that it amounted to "intentional maltreatment." *Jolly v. Knudsen*, 205 F.3d 1094, 1097 (8th Cir. 2000) (internal quotation marks omitted). Neither Dr. Bogan nor Dr. Craane indicated that Bakambia's headaches and the corresponding pain he has experienced since he was assaulted at MCF-Rush City would have been ameliorated had a referral to a neurologist been made sooner. Thus, these records say little, if anything, about whether the Centurion Defendants provided constitutionally adequate care during the 19-month period between Bakambia's July 2019 transfer to MCF-Stillwater and the January 2021 referral, or between that referral and Dr. Craane's referral in October 2021. Moreover, even if Dr. Bogan or Dr. Craane had opined that a neurological referral should have been made sooner, such a difference of opinion regarding the appropriate course of treatment would not, by itself, create a genuine issue for trial. *Brewer v. Graves*, 152 Fed. App'x 548, 549 (8th Cir. 2005)

---

[14] It is worth noting that Bakambia's amended complaint was filed on January 11, 2021, and both Dr. Bogan's and Dr. Craane's decisions for a neurologist's evaluation are not themselves the subject of any supplemental pleading concerning events that post-date the operative complaint. *See* Fed. R. Civ. P. 15(d) (providing that a court may allow a supplemental pleading setting out events that happened after the date of the pleading to be supplemented). The Court considers them here only to the extent that Bakambia contends they constitute evidence establishing that between his transfer to MCF-Stillwater and the filing of the amended complaint, the Centurion Defendants were deliberately indifferent to his headache complaints because they did not refer him to a neurologist.

("That Mr. Brewer and his medical expert, Dr. Silberman, disagree with the course and timing of this treatment does not create a genuine issue of fact as to whether the doctors were deliberately indifferent to his serious medical needs.").

### 3. Abdominal Pain

Bakambia argues that summary judgment should be denied because he has offered evidence showing that the Centurion Defendants, collectively, but especially P.A. Plackner, were aware of his history of a 2018 hernia repair and knew of his complaints regarding significant abdominal pain, including the feeling of a "ripping inside" his stomach. Despite that knowledge, he asserts that the Centurion Defendants deliberately disregarded those complaints "to pursue [an] unrelated diagnosis of H. pylori." He contends that as a result of that misguided focus, Bakambia developed another hernia and will need to undergo surgery. Dkt. No. 323 at 19 (citing Dkt. No. 325 at 2–3, which discusses ventral hernia repair on Sept. 5, 2018).

Essentially, Bakambia's claim regarding his abdominal pain is one of misdiagnosis. "To show deliberate indifference in a misdiagnosis, [Bakambia] must show defendants were more than grossly negligent. Negligent misdiagnosis does not create a cognizable claim under § 1983." *Allard*, 779 F.3d at 772 (cleaned up). Bakambia has failed to meet his burden. It is undisputed that Bakambia was diagnosed with an H. pylori infection in February 2020, for which treatment was made available, and Plackner's notes indicate that he believed Bakambia's symptoms would resolve following that treatment. Dkt. No. 77 at 23. After Bakambia finished the antibiotic course on February 24, 2020, Plackner put in an order to check a stool sample at the end of March to determine whether the treatment was effective, and Plackner provided Bakambia with supplies to collect the

sample. Bakambia alleges that his abdominal symptoms did not improve and in January 2021, an X-ray revealed gas-filled loops of bowel. Then, in October 2021, Dr. Craane diagnosed Bakambia with a hernia. Dkt. No. 315-1 at 2. Taken in the light most favorable to Bakambia, these facts may, at most, suggest negligence, though Bakambia has not pointed to any evidence to suggest that the hernia found in 2021 could have been diagnosed in February or March of 2020 had Plackner not focused on the H. pylori infection. Even crediting that Plackner was aware of Bakambia's 2018 hernia, there is no evidence to support an inference that Plackner chose to treat the H. pylori infection because he was indifferent to a possible hernia. Nor has Bakambia presented any evidence from which a reasonable jury could conclude that Plackner's treatment of the H. pylori infection so deviated from professional standards that it amounts to deliberate indifference.

Accordingly, the Centurion Defendants are entitled to summary judgment on this claim.

### 4. Neutropenia

Bakambia argues that Plackner was deliberately indifferent to his serious medical needs as a result of his handling of Bakambia's neutropenia diagnosis. He asserts that Plackner failed to disclose or discover the cause of his neutropenia. Dkt. No. 323 at 8. Bakambia also points to excerpts of *The Merck Manual of Medical Information* discussing neutropenia and suggests that if the cause is unknown, it must be determined. Dkt. No. 324 ¶¶ 88, 91; Dkt. No. 325-1 at 67–69.

Bakambia has failed to demonstrate a genuine issue for trial on the subjective prong of his deliberate indifference claim based on Plackner's handling of his neutropenia

diagnosis.[15] The evidence shows that Plackner reviewed and discussed with Bakambia the lab work that resulted in the neutropenia diagnosis and was receptive to Bakambia's desire to have another CBC within three months instead of six. Dkt. No. 58 at 20. Rather than illustrating that Plackner was indifferent to this condition, the evidence demonstrates that he was attentive to it and attempted to address it using his medical judgment. *See Byng*, 2012 WL 967430, at *12 (granting summary judgment on deliberate indifference claim where there was no evidence that failure to refer a patient for further treatment of neutropenia was anything other than "the product of [the defendant's] own medical judgment").

### 5. Medications Prescribed in January 2021

Bakambia argues that the Centurion Defendants have been deliberately indifferent to his serious medical needs because, after his January 16, 2021 trip to the ER, he was prescribed, among other things, lidocaine patches to address his complaints of pain, but he has not received that prescribed medication. Dkt. No. 323 10–11. However, Bakambia has not provided any evidence that demonstrates the Centurion Defendants played any role in denying him any medication prescribed by the ER physician he saw on January 16.

Bakambia references other inmates who either received or were denied lidocaine prescriptions to treat various conditions. Bakambia includes a declaration from another inmate who was prescribed a lidocaine patch to treat pain in his ribs, and asked an

---

[15] It is unclear from the record whether Bakambia claims to have suffered any adverse effects on his health as a result of the lower white blood cell count, and at least one court has concluded that absent such adverse effects, neutropenia is not a sufficiently serious medical condition to support the objective prong of the deliberate indifference standard. *Byng v. Wright*, No. 09 Civ. 9924, 2012 WL 967430, at *12 (S.D.N.Y. Mar. 20, 2012).

interrogatory concerning yet another another inmate's receipt of a lidocaine prescription from Dr. Shicker. Dkt. No. 324 ¶¶ 17–19 (citing EF No. 324-2 at 24–25, 87). These exhibits to Bakambia's declaration, even taken in the light most favorable to his opposition to summary judgment, do not support his deliberate indifference claims. The care provided to other inmates is irrelevant to whether the Centurion Defendants provided constitutionally adequate care to Bakambia for his serious medical needs.

### 6.  Other Arguments

A number of other arguments raised in Bakambia's response to the Centurion Defendants' motion do not demonstrate the need for a trial. For example, Bakambia asserts that there is a genuine issue of whether the Centurion Defendants were dishonest in their responses to his complaints to the Medical Board. Dkt. No. 323 at 14–15. Whether the Centurion Defendants were honest with the Medical Board is not material to the resolution of Bakambia's Eighth Amendment claim because it has no bearing on whether they were deliberately indifferent to his serious medical needs.

Bakambia argues that because Dr. Quiram met with him for only two minutes or less at their appointments, and Dr. Quiram told the medical board that he schedules twenty-minute clinic appointments, there is a fact dispute requiring a trial on his deliberate indifference claim. Dkt. No. 323 at 22–23. In his amended complaint, Bakambia alleged that Dr. Quiram met with him only briefly on several occasions. Dkt. No. 117 ¶¶ 38, 41, 43, 47. And Bakambia provided evidence (his own declaration), indicating that on several occasions, Dr. Quiram met with him for less than two minutes. Dkt. No. 324 ¶¶ 26, 29, 31, 33, 58 (referring to appointments on July 31, 2019, Aug. 13, 2019, Sept. 9, 2019, Oct. 9, 2019, and Dec. 20, 2019). Taken in the light most favorable to Bakambia, this

declaration testimony could allow a jury to conclude that Dr. Quiram's appointments with Bakambia were quite brief. However, based on the evidence in the record, the Court finds that such a dispute does not defeat the motion for summary judgment because a reasonable jury could not conclude that Dr. Quiram was deliberately indifferent to Bakambia's serious medical needs.

The relevant medical records for the office visits where Dr. Quiram allegedly met with Bakambia for only a brief period show that Dr. Quiram was presented with Bakambia's complaints about two main issues. One of those complaints concerned Bakambia's eyesight, and in this litigation, Bakambia has alleged that it took too long to get in to see an eye doctor. However, Dr. Quiram noted on his first encounter with Bakambia that he had been referred to an optometrist regarding his visual acuity concerns. Dkt. No. 325 at 16. Bakambia provides no evidence to suggest that Dr. Quiram was responsible for any delay in Bakambia's ability to get in to see the optometrist.

Bakambia also complained about his ongoing headaches. Dr. Quiram's assessments of this issue, though allegedly accomplished in very brief encounters, led to diagnoses of posttraumatic headache, traumatic brain injury, and chronic headaches. Though Bakambia repeatedly requested an MRI and a neurology consultation, Dr. Quiram concluded that these were not medically indicated and prescribed Topamax to treat Bakambia's concerns. But in light of the persistence of Bakambia's complaints, he referred Bakambia to Dr. Shicker for further evaluation, which resulted in similar conclusions. Dkt. No. 325 at 16, 24; Dkt. No. 325-1 at 29, 31. Bakambia offers no evidence to suggest that Dr. Quiram failed to exercise his independent medical judgment in coming up with a treatment plan. Under these circumstances, the Court concludes that

a reasonable jury could not conclude that Dr. Quiram's allegedly brief meetings with Bakambia on the dates in question were the product of deliberate indifference.

### C.    Loss of Chance of Recovery or Survival

The Centurion Defendants argue that to the extent Bakambia has alleged a medical malpractice claim against them, they are entitled to summary judgment on such a claim. Dkt. No. 241 at 13 n.4. The Court agrees that the Centurion Defendants are entitled to summary judgment on such a claim.

In his amended complaint, Bakambia asserts a claim under the loss of chance of recovery or survival doctrine. Dkt. No. 117 at 33. Under Minnesota law, this refers to a theory of damages for medical malpractice claims. *Dickhoff ex rel. Dickhoff v. Green*, 836 N.W.2d 321, 336–37 (Minn. 2013) ("Minnesota law permits a patient to recover damages when a physician's negligence diminishes or destroys a patient's chance of recovery or survival."). However, to the extent Bakambia has asserted a medical malpractice claim, his claim fails because Bakambia did not submit either of the expert affidavits required to sustain such a claim. Minn. Stat. § 145.682, subd. 2–4 (requiring one expert affidavit to be served with the summons and complaint and another to be filed within 180 days of commencement of the lawsuit). In a case such as this, where any alleged negligence by the Centurion Defendants does not "speak[] for itself," Bakambia's failure to offer the affidavits required to support a medical malpractice claim requires its dismissal. *See Bellecourt v. United States*, 994 F.2d 427, 431–32 (8th Cir. 1993) (affirming district court's dismissal of malpractice claim unsupported by timely filing of expert affidavits); *id.* at 432 (citing *Todd v. Eitel Hosp.*, 237 N.W.2d 357, 361 (Minn. 1975) as identifying "having a sponge [left] inside [the] body following surgery" as case where expert testimony would

not be required); *see also Flores v. United States*, 689 F.3d 894, 899–900 (8th Cir. 2012) (affirming dismissal of medical malpractice claim where no expert affidavits were provided by the plaintiffs).

### RECOMMENDATION

For the reasons discussed above, the Court RECOMMENDS that the Centurion Defendants' motion for summary judgment [Dkt. No. 240] be **GRANTED**. Because Dr. Shicker, Dr. Quiram, and Brent Plackner, P.A., are entitled to judgment as a matter of law, the claims against them should be dismissed with prejudice.

Dated: January 18, 2022                              _____s/David T. Schultz_____
                                                                          DAVID T. SCHULTZ
                                                                          U.S. Magistrate Judge

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).